In re BARNETT.

BARNETT v. JASPAN.

No. 66.

Circuit Court of Appeals, Second Circuit.

Argued Nov. 7, 1941.

Decided Jan. 7, 1942.

1006

Louis P. Rosenberg, (Robert H. Epstein, of counsel), for trustee-appellee.

Abraham R. Kartzman, (Jacob M. Mandelbaum, of counsel), for bankrupt-appellant.

Before L. HAND, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

The District Court, reversing an order of the referee, declared that an instrument by which Cecelia Barnett, the bankrupt, assigned to her mother, Clara Essenfeld, her testate and intestate interest in her father's estate, was invalid as to her trustee in bankruptcy. In 1935, her father had made a will, leaving to her 15% of his residuary estate. The following year she assigned to her mother, in consideration of $5,000 paid by her father, all her rights, in intestacy or under any will previously or thereafter made, to her father's estate. Some four years later, on August 29, 1940, she filed a voluntary petition in bankruptcy and was adjudicated. On the following day her father died, and his 1935 will was admitted to probate soon thereafter.

The trustee in bankruptcy petitioned for an order directing the bankrupt to execute an instrument assigning her interest in her father's estate to the trustee, free and clear of the claims of Clara Essenfeld, and restraining her father's executors from recognizing the assignment to Mrs. Essenfeld and from making payments pursuant to it. The bankrupt and Mrs. Essenfeld contested the application on the merits; the executors appeared, but did not oppose. The referee held the assignment was valid as against the trustee, and denied his application. The judge reversed and granted the requested order. The bankrupt has appealed.

No appeal was prayed by the other parties. But the attorney for the bankrupt signed his brief, filed in this court, as attorney both for the bankrupt and her mother Mrs. Essenfeld. He apparently believed that the rights of the mother were before this court. No objection to his thus signing his brief was made by the trustee. Going below the surface appearances and viewing the situation realistically, as the Supreme Court admonishes us to do,[1] it is obvious that the mother assumed that the order, so far as it affected her, would be dealt with by us on this appeal.

■ 1. In the brief which he filed here, counsel for the bankrupt and her mother, seemingly believing that the District Court had correctly decided that the assignment was invalid as against the trustee, asserted that the order was erroneous on another ground not argued in the trial court, i. e., that the consideration paid to the bankrupt by her father operated as an ademption. The trustee strenuously argued that we should not consider that new issue. Although we are inclined to agree that, if the assignment were invalid, there was an effective ademption, we prefer not to decide the case on that basis. We do not feel that we are precluded from deciding on a ground not pressed by counsel.[2] Such a course, however, is undesirable

where not necessary; it is usually better, if possible, to consider a case as it was presented to the lower court.[3] If the trustee opposed our consideration of the ground relied upon by the lower court merely because it was abandoned on appeal by his adversary, we would still feel free to consider it; where, as here, the trustee expressly urges that only the original theory is open to us, we are of course doubly justified in preferring to rest upon that theory rather than upon the new one.

■ 2. Disregarding the ademption issue, it is clear that, were it not for the assignment, the trustee would win; for § 70, sub. a(8) of the amended Bankruptcy Act, 11 U.S.C.A. 110, sub. a(8), removes whatever doubt there formerly was as to his right to claim the bankrupt's share of the testator's estate. The trustee's status to avoid the assignment, conferred by § 70, sub. c is, as of the date of bankruptcy, that of "a judgment creditor then holding an execution returned unsatisfied, whether or not such a creditor actually exists." Since this status is granted by § 70, sub. c as to "property," there is a possible question that an "expectancy" is not therein included, but we pass it as no more than a quibble, and turn to the more substantial issue of whether, in New York, a judgment creditor may avoid an assignment of an expectancy.

■ As early as 1867, in Stover v. Eycleshimer, 4 Abb.Dec. 309, 42 N.Y. 620, 3 Keyes 620, it was held that the assignment of an expectancy is enforceable in equity. With apparently only one exception, In re Zimmerman's Will, 104 Misc. 516, 172 N.Y.S. 80, later referred to as "mistaken" (In re Strange's Estate, 164 Misc. 929, 300 N.Y.S. 23), that doctrine has stood the test of time. Nugent v. Smith, 202 App. Div. 279, 195 N.Y.S. 338; In re Eisner's Will, 129 Misc. 106, 221 N.Y.S. 598; In re Cornell's Will, 170 Misc. 638, 12 N.Y.S. 2d 162. In Stover v. Eycleshimer, it was held that the assignee's rights were superior to those of a creditor who levied an

[1] "As is true of many problems in the law, the answer is to be found not in legal learning but in the realities of the record." City of Indianapolis v. Chase National Bank, November 10, 1941, 62 S.Ct. 15, 16, 86 L.Ed. ——.

[2] See, for a recent elaborate decision on an issue not presented by the parties, Radtke Patents Corp. v. Coe, App.D.C., 122 F.2d 937, 955.

[3] For that reason it has been held that an appellate court may properly remand a case for further proceedings, "if the case has been tried on a wrong theory" and the correct theory was not considered by the parties either in the pleadings or in their arguments on appeal. Finefrock v. Kenova Mine Car Co., 4 Cir., 22 F.2d 627, 634; see, also, Underwood v. Commissioner, 4 Cir., 56 F.2d 67, 73.

attachment on the interest of the assignor and obtained a judgment after the testator's decease. The same result was reached in Re Cornell's Will, 170 Misc. 638, 12 N.Y. S.2d 162, where the creditor recovered judgment before the testator's death. This holding is in accord with the general view in other jurisdictions. See cases there cited, and Annotations, 17 A.L.R. 597, 612; 44 A.L.R. 1465; cf. Williston, Contracts, § 1681A. Stover v. Eycleshimer, supra, has become a leading case, and has been widely taken to hold broadly that the assignee's rights are superior even where the judgment is entered before the testator's death. In fact, Hale v. Hollon, 90 Tex. 427, 39 S.W. 287, 36 L.R.A. 75, 59 Am.St. Rep. 819, relied upon by the New York court in Re Cornell's Will, had, in turn, placed reliance for its position upon Stover v. Eycleshimer. Although one or two cases decided by a subordinate state court might not conclude us, we cannot assume that In re Cornell's Will is incorrect and that New York, the fountain head of liberal enforcement of such assignments, would go contrary to the overwhelming view in other jurisdictions. The trustee cannot rely on the assignee's failure to record her assignment under § 32, Personal Property Law, or § 274, Real Property Law, because, in New York, he is not a "subsequent purchaser or mortgagee." See In re Sherower's Estate, 171 Misc. 295, 12 N.Y.S.2d 530, where a receiver appointed on supplementary proceedings was able to avoid a similar assignment only by showing fraud; and cf. In re Eckel's Will, 256 App.Div. 1031, 10 N.Y.S.2d 837.

Our conclusion is not in conflict with our decision in Irving Trust Co. v. Commercial Factors Corp., 2 Cir., 68 F.2d 864, upon which the court below relied. That case held that an equitable lien created by a factoring agreement could not be upheld against a trustee in bankruptcy unless it was perfected by the taking of possession more than four months before bankruptcy. That decision, like ours here, rested upon New York law. The New York cases there cited showed that certain types of equitable liens, especially those created by mortgages and pledges of after-acquired property, could not withstand the onslaught of creditors who obtained judgment before the mortgagee or pledgee took possession. Titusville Iron Co. v. New York, 207 N.Y. 203, 100 N.E. 806; Zartman v. First National Bank, 189 N.Y. 267, 82 N.E. 127,

12 L.R.A.,N.S., 1083; Rochester Distilling Co. v. Rasey, 142 N.Y. 570, 37 N.E. 632, 40 Am.St.Rep. 635; In re Friedman, 2 Cir., 72 F.2d 412, and Okin v. Isaac Goldman Co., 2 Cir., 79 F.2d 317, similarly turning on New York law, did not involve the equitable rights of assignees of expectancies. It is not our duty, of course, to explain why the New York courts distinguish between the validity of mortgages and pledges of after-acquired property, and assignments of expectancies.

■ 3. So that the pertinent facts should more clearly appear, we have followed the unusual course of first discussing the merits. We now turn to the trustee's contention that the appeal must be dismissed because the bankrupt, sole appellant, was not affected by the decree and hence is not a proper party appellant. It is true, as the bankrupt admits in her brief, that the adjudication as between the trustee in bankruptcy and the assignee, is not, as such, her concern. But the trustee petitioned for, and the District Court granted, an order requiring the bankrupt to execute an instrument assigning her rights to the trustee in bankruptcy. That this order is appealable there can be no doubt, for if the assignment was valid, then the District Court lacked power to compel the bankrupt to execute an assignment. This is true regardless of whether such an assignment would deprive the bankrupt of any substantial property rights. For a citizen cannot be wrongfully compelled by a court to do any involuntary act, and therefore, if the District Court's order was in error, it should be reversed. Moreover, it must be noted that the assignment, executed by the bankrupt to her father for the benefit of her mother, in 1934, contained an express covenant on bankrupt's part to execute all further necessary instruments to vest and confirm title in the property assigned, in effect, substantially a covenant for further assurance. Without deciding whether or not such a covenant would be completely terminated by the order entered below, we may point out that this covenant demonstrates still more the practical interest of the bankrupt in opposing the order, an interest, too, upon which the other parties might well be expected to depend. Compare Tuffy v. Nichols, 2 Cir., 120 F.2d 906, 908, certiorari denied 62 S.Ct. 113, 86 L.Ed. ——, Oct. 13, 1941.

■ 4. As previously observed, the other parties adversely affected by the

lower court's order did not pray an appeal. Had they done so, it is clear, from our opinion, that we would have held the order erroneous as to them. We are clear that we have the power to order a reversal as to them even though they did not appeal, and that we should do so under the circumstances here disclosed. The anomalous position of the parties otherwise, and the quite naturally embarrassing questions which would confront the state court if the order, stigmatized by us as erroneous, remains partially in effect, are patent. The state court must certainly pass upon the issue of ademption if that issue ever arises (as it surely must if we were to set the assignment aside). How far it is to go and how far the non-appealing parties can go, in view of the injunction entered against them below, would be left in some ambiguity, for it would seem that that question is not at all settled in the proceedings herein. Beyond this, however, if the trustee cannot claim the property as against the bankrupt, as we now hold, the state court might possibly consider that it could order distribution of the estate to the assignee, but it would be embarrassed by the order against its own fiduciaries, the executors of the estate. Hence complete reversal is the only proper way to avoid unnecessary complications and ambiguity.

Moreover, it is patent that, although the bankrupt's mother did not herself explicitly appeal, she assumed that her rights would be brought before this court on the appeal taken by the bankrupt.[4]

 We have jurisdiction in the premises. Several courts have recognized that, where reversal of a judgment wipes out all basis for recovery against a non-appealing, as well as against an appealing, defendant, the reversal may operate to the benefit of both. Kline v. Moyer, 325 Pa. 357, 191 A. 43, 111 A.L.R. 406; Gebhardt v. Village of La Grange Park, 354 Ill. 234, 188 N.E. 372; Maryland Casualty Co. v. City of South Norfolk, 4 Cir., 54 F.2d 1032; and cf. Merchants Discount Corp. v. Federal Street Corp., 300 Mass. 167, 14 N.E.2d 155, 118 A.L.R. 412; Rowell v. Ross, 89 Conn. 201, 93 A. 236; 5 C.J.S., Appeal & Error, § 1920, p. 1423; 3 Am.Jur. 695; Shreeder v. Davis, 43 Wash. 129, 86 P. 198, 10 Ann.Cas. 80; L.R.A.,N.S., 310.

 In such a case as this, we should, then, consider the parties to the order below as before this court, at least to the extent that where modification of the judgment affecting them is necessary in order to afford proper and adequate relief to appellant, they are bound thereby. And we should make every effort to achieve such a result here since, as already observed, it is obvious that the bankrupt's mother, one of the parties below, and for whose benefit, the bankrupt's assignment to her father was made, assumed that a reversal of the order would mean a reversal as to her. The executors are mere stakeholders, and to reverse as to the bankrupt and her mother, leaving outstanding an order enjoining the executors, would be to frustrate the relief afforded by our decision. In declining to make a narrow disposition of this appeal, which will afford only inadequate relief to the parties and leave in effect a truncated order, we are in part guided by the fact that a court of bankruptcy is a court of equity,[5] and that once a court of equity has taken jurisdiction of a case, it will endeavor, in order to do justice, to dispose harmoniously of all its aspects. It is established doctrine, furthermore, that in disposing of a case before it, an appellate court has a broad power "to make such disposition * * * as justice requires."[6]

---

[4] We note in passing, that the new Federal Rules of Civil Procedure may have induced the bankrupt's mother and her counsel to believe that her rights were brought before this court on the appeal of the bankrupt, without regard to the considerations later discussed in this opinion.

Formerly the federal practice of petition for allowance of the appeal and citation on appeal, coupled with the old rule of summons and severance in case of joint judgments, would lead to the elimination of certain parties from the appeal and formal naming of others in the appeal citation. Now the old rule of summons and severance (applicable as well in bankruptcy as elsewhere, 2 Moore's Collier on Bankruptcy, 14th Ed. 1940, par. 25.08 and cases cited note 11) has been abolished; Federal Rules of Civil Procedure, rule 74, 28 U.S.C.A. following section 723c; Bankruptcy, General Order 36, 11 U.S.C.A. following section 53.

[5] Securities & Exchange Comm. v. United States Realty & Improvement Corp., 310 U.S. 434, 455, 60 S.Ct. 1044, 84 L. Ed. 1293.

[6] State of Minnesota v. National Tea Co., 309 U.S. 551, 555, 60 S.Ct. 676, 679, 84 L.Ed. 920; Dorchy v. Kansas,

We recognize that, in following cases like Kline v. Moyer and other cases cited above, we are adopting a procedure rejected by some courts. But adherence to a stricter procedure in such cases seems to us to derive from an excessive veneration for what Wigmore and others have properly criticized as the "sporting theory of justice."[7]

A member of this court, Judge Augustus N. Hand,[8] twenty three years ago, while a District Judge did not hesitate to abandon that outmoded theory: In a jury case, for goods sold and delivered, before the trial began, and without the consent of the parties, he made an order appointing an auditor to examine the books and papers, make computations, hear testimony and file a report, separating the disputed from the undisputed items, and expressing an opinion as to those in dispute; the order provided that the report should function as prima facie evidence of the facts found and conclusions reached by the auditor, but left the parties free to call, examine and cross-examine witnesses as if the report had not been made. Peterson v. Davidson, D.C., 254 F. 625. The Supreme Court, in affirming that order, approved of the innovation, saying that the Seventh Amendment had not, because of the precedents, prohibited "the introduction of new methods. * * * New devices may be used to adapt the ancient institution to present needs and to make of it an efficient instrument in the administration of justice. Indeed, such changes are essential to the preservation of the right." Ex Parte Peterson, 253 U.S. 300, 309-310, 40 S.Ct. 543, 546, 64 L.Ed. 919. In so holding, the Supreme Court rejected the argument, resting on the "sporting theory," that the parties had not given their consent.

That theory stems from the original function of trials in courts as substitutes for private wars. That function, to be sure, is still of prime importance. Chambers v. Baltimore & O. R. Co., 207 U.S. 142, 148, 28 S.Ct. 34, 52 L.Ed. 143. But we think that courts, in civilized communities, should do more than decide cases, one way or another, without regard to considerations of justice, merely to prevent private brawls and breaches of the peace. Government having, through its courts, established, in large areas, a monopoly of dispute-deciding,[9] should try, as far as possible, to decide cases correctly—both by ascertaining the actual facts, as near as may be, and then by applying correct legal rules in an effort to do justice to the parties affected by their decisions. And not merely the parties, but the public as well, are interested that justice shall be done. The Supreme Court has said that "a trial in court is never * * * 'purely a private controversy * * * of no importance to the public.' "[10] While the obligation to do justice does not mean, of course, that courts can act ad lib, the fact that such tribunals are called "courts of justice" is surely not without any significance. We should no longer look upon a lawsuit as if it were "in the nature of a cock-fight," so that "the litigant who wishes to succeed must try and get an advocate who is a game bird with the best pluck and the sharpest spurs." [11]

As Wigmore says, the judge should "cease to be merely an umpire at the game of litigation. Often he is little more. This, to be sure, is in part the continuance of a tradition, inherited from the spirit of gentlemanly sportsmanship which dominated the administration of British justice. But it has been intensified, instead of lessened, by the spirit of strenuous struggle and unrestrained persistence which drives the bar of our country to wage their contests to the extreme of technicality." Wigmore also remarks that "the common law, originating in a community of sports and games, was permeated essentially by the instinct of sportsmanship. This has had both its higher aspect and its lower aspect. On the one hand, it has contributed a sense of fairness, of chivalrous behavior to a worthy adversary, of carrying out a contest on equal and honorable terms. The presumption of innocence, the character rule, the privilege against self-crimination, and other specific rules * * * show

---

264 U.S. 286, 289, 44 S.Ct. 323, 68 L. Ed. 686.

[7] For a recent judicial criticism, see Simon v. United States, 4 Cir., 123 F.2d 80, 83.

[8] Not sitting in the instant case.

[9] Cf. Tourtoulon, Philosophy in the De- velopment of Law (transl. 1922), 116, 121–126.

[10] New York Central R. R. Co. v. Johnson, 279 U.S. 310, 318, 49 S.Ct. 300, 303, 73 L.Ed. 706.

[11] Manson, quoted with approval in Pound, Do We Need a Philosophy of Law? 5 Col.L.Rev.(1905) 338, 347.

the effect of this instinct against taking undue advantage of an adversary. The minor rules of professional etiquette * * * illustrate the same tendency even more clearly. On the other hand, it has contributed to lower the system of administering justice * * * to the level of a mere game of skill or chance * * * in the general attitude towards rules of procedure as expedients for winning the game of litigation * * * The right to use a rule of procedure or evidence precisely as one plays a trump card, or draws to three aces, or holds back a good horse till the home stretch, is a distinctive result of the common-law moral attitude toward parties in litigation."[12] Thanks to such criticisms, there has developed, inter alia, the doctrine of "harmless error,"[13] which, to the chagrin of those devoted to a conception of litigation as a game of skill, has led to a marked reduction of reversals based upon procedural errors which do no real harm.

Of course, courts should be exceedingly cautious in disturbing (at least retrospectively)[14] precedents in reliance on which men may have importantly changed their positions. Other deviations from traditions, which have no such hurtful consequences, but which, relating solely to procedure, improve the administration of justice, may win adverse criticism from those members of the bar who regard all procedural changes as wrong because, as Wigmore puts it, they interfere with the "mere mental convenience of the profession." Wigmore notes that "such a naive confession as that of Lord Ellenborough we do not often receive, but its significance is radical: 'If that rule were to be changed, a lawyer who was well stored with these rules would be no better than any other man is without them.' "[15]

Nothing we have said is to be taken as disparaging the contentious mode of procedure, which has demonstrable values: It aids courts in effectively discharging their basic function of deciding disputes because, in the clash of wits between the contending parties, factual and legal aspects of a case, which might otherwise be ignored, are brought sharply to the court's attention. For that reason, the federal courts are forbidden by the Constitution to give decisions except in respect of actual "cases or controversies." But while a court must often rely chiefly on the arguments of opposing counsel, and while, as a consequence, inadequate arguments may sometimes lead courts to overlook points which counsel have not pressed (so that, indeed, the decision may have little value as a precedent),[16] the occasional resulting incompleteness or error in a decision should not be cherished as a virtue. A court, striving to do justice between the parties, should not put on blinders and ignore matters which counsel overlook. We do not, however, mean to suggest that there are no limits to the extent to which a court may relieve a party from the procedural mistakes of his lawyer; thus, for instance, we would be powerless here if no party had appealed.

5. There is to be considered the following alternative route by which the same result might be reached as to the vacation of the order concerning the non-appealing parties: In Simmons Co. v. Grier Bros. Co., 258 U.S. 82, 42 S.Ct. 196, 66 L.Ed. 475, suit was brought for both patent infringement and unfair competition. Subsequently, and while the unfair competition issue was still pending, the Supreme Court, reversing the decree in another suit, brought in another circuit and between different parties, held that same patent valid.

[12] Wigmore, Evidence, 3d Ed. 1940, I, 374; VI, 374–376.

[13] For its development and growth from judicial doctrine, by way of statute, into F. R. C. P. 61, see Moore, 3 Federal Practice 3285.

[14] Cf. Great Northern Ry. v. Sunburst Oil Co., 287 U.S. 358, 364, 53 S.Ct. 145, 77 L.Ed. 360, 85 A.L.R. 254.

[15] Wigmore, The Judicial Function, in Science of Legal Method (1917) xxvi, xxxviii–xxxix. Cf. IX, Holdsworth, History of English Law, 417, quoting Hayes, Dialogue, an admirable satire on strict rules of procedure, in which Baron Surrebutter says, "Why, if special pleading were abolished, what would become of the New Rules, and the valuable decisions on them, in the sixteen volumes of Meeson and Welsby?" Coleris, M.R. in Re Coles and Ravenshaw (1907), I KB-4, said that "the relations of rules of practice to the work of justice should be that of handmaid rather than mistress," and that courts ought not to be so tied by procedural rules "as to do what will cause injustice in the particular case."

[16] Webster v. Fall, 266 U.S. 507, 45 S.Ct. 148, 69 L.Ed. 411.

Thereupon, in the Grier Bros. suit, the District Court, on a bill of review filed by the plaintiff, vacated its earlier decree and entered a new decree sustaining the patent. The Court of Appeals reversed this decree on the ground that, on the facts presented, a bill of review could not be maintained. The Supreme Court, however, reversed the Court of Appeals: It held that, because of the pendency of the unfair competition issue, the earlier decree dismissing as to the patent issue was not final; that, accordingly, no bill of review was necessary to vacate it, a mere motion for rehearing being sufficient for that purpose; that the bill of review would be regarded as such a motion; and that it was the duty of the District Court to grant rehearing and to vacate the earlier decree, in order to avoid, where possible, the anomaly of discrepant legal rulings as to different parties concerning an identical subject matter.

The Supreme Court held that the fact that the plaintiff, by asking the District Court to dismiss its action as to the patent, had acquiesced in the first decision of the Court of Appeals against the patent's validity,[17] did not preclude such subsequent relief when a higher court sustained that patent in another suit. So here, the failure of the bankrupt's mother and the executors to pray an appeal from the order of the District Court, if regarded as an acquiescence in that order, should not preclude them from similar relief now that, on the appeal of the bankrupt, an upper court finds the legal foundation of that order to have been fatally defective. Accordingly, as considerations similar to those in the Grier Bros. case exist here,[18] it would seem that we could direct the District Court to entertain a motion for rehearing by the bankrupt's mother and the executors, and, pursuant thereto, to vacate its prior order and sustain the order of the referee.

In the Grier Bros. case, as above noted, the earlier decree holding the patent invalid was not final because the action as to unfair competition was still pending. In the instant case, the order as to the bankrupt's mother and the executors is not final because it was entered in a bankruptcy proceeding where an order may be vacated, on motion for rehearing, at any time before the bankruptcy proceeding is terminated. Wayne United Gas Co. v. Owens-Illinois Glass Co., 300 U.S. 131, 57 S.Ct. 382, 81 L.Ed. 557.

However, more than six months have elapsed since the order was entered in the instant case; Rule 60(b) sets a limit of six months for reopening of orders except by bill of review; and the Grier Bros. case leaves some doubt whether a bill of review would lie here. But it is by no means clear that the Supreme Court intended by Rule 60(b) to expunge the well-considered doctrine of the Grier Bros. case in circumstances such as exist here, where the very basis for reopening the earlier order—i. e., the subsequent upper court decision—did not exist until the six months had expired.[19] It may also be questioned whether, in the light of the Wayne United Gas Co. case, G. O. in Bankruptcy 37[20] makes Rule 60(b) fully applicable to bankruptcy proceedings in matters of time limitation. Cf. Kroell v. New York Ambassador, 2 Cir., 108 F.2d 294.

But, as we are reluctant to determine those questions unnecessarily, we rest our conclusion as to the vacation of the order concerning the non-appealing parties, on the alternative ground previously discussed. We feel the more justified in doing so, since thereby we avoid an anomalous result, like that which the Supreme Court found undesirable in the Grier Bros. case, should it be true that Rule 60(b) renders the doctrine of the Grier Bros. case im-

---

17 It is to be noted that when the plaintiff thus acquiesced, it knew that the patent had been held valid in the other suit by another Court of Appeals and that a petition for certiorari had been filed. See Grier Bros. v. Baldwin, 3 Cir., 265 F. 481, 485.

18 Perhaps even stronger considerations. Cf. cases as to the "law of the case" doctrine. Luminous Unit Co. v. Freeman-Sweet Co., 7 Cir., 3 F.2d 577, 580; Johnson v. Cadillac Motor Car Co., 2 Cir., 221 F. 801, L.R.A.1915E, 287, Ann.Cas. 1917E, 581; Adams v. Messinger, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152;

cf. Riehle v. Margolies, 279 U.S. 218, 220, 49 S.Ct. 310, 73 L.Ed. 669, et seq.

19 In the discussion of that Rule, prior to its adoption, the Grier Bros. case was not mentioned and seems not to have been considered. 3 Moore's Federal Practice (1938), p. 3261, note 36, cites the Grier Bros. case as if it were still effective despite Rule 60(b).

20 "In proceedings under the Act the Rules of Civil Procedure for the District Court of the United States shall, in so far as they are not inconsistent with the Act or with these general orders, be followed as nearly as may be."

potent after six months. Cf. Rorick v. Commissioners, 307 U.S. 208, 213, 59 S.Ct. 808, 83 L.Ed. 1242; Reconstruction Finance Corp. v. Prudence Securities Advisory Group, 311 U.S. 579, 582, 61 S.Ct. 331, 85 L.Ed. 364.

6. The trustee, in his brief and initially in his oral argument, sought to sustain the order in its entirety, including that part of the order which directed the bankrupt to execute an assignment to the trustee. Subsequently, in the course of the oral argument, however, a member of this court asked the trustee's counsel whether he would consent to a deletion of that part of the order, and he said he would. That consent, thus prompted, was, in effect, no more than a belated attempt to accomplish a voluntary dismissal, at least in part, of the trustee's action, for we may treat his petition to the referee, to have the bankrupt make the assignment, as the equivalent of an action. Such an attempt voluntarily to dismiss does not, without approval by this court, render the case moot. By Rule 41[21] of the Federal Rules of Civil Procedure, an action in the District Court may be dismissed, after an answer has been filed, only by permission of the court. The very purpose of the rule is to provide that the mere effort of a plaintiff to withdraw his suit should not make the case moot.[22] By General Order 37, the rules have been made applicable to proceedings in bankruptcy, so far as not inconsistent with the Bankruptcy Act. We should not disregard the policy embodied in Rule 41 but should be guided by the same considerations as would have been applied under the rule had the trustee, in similar circumstances, endeavored similarly to dismiss while the case was in the District Court. Certainly the appellee (petitioner below) should not have a greater right to dismiss an appeal which he has not brought than he would have in respect of the original action.

We have already said that the rights of the bankrupt's mother are before us on this appeal by the bankrupt. When the voluntary dismissal was attempted, the time for the mother to pray an appeal had expired and that dismissal, if permitted, would therefore trap her. Because of that fact and the general importance of the issue presented, and because the judgment below is a broad adjudication of a status which may affect later proceedings in the state court, we decline to permit the deletion of the order without a determination of the real question before us.

The order appealed from is reversed, and the District Court is directed to affirm the order of the referee so far as it "in all respects denied" the prayer of the trustee's application herein.

L. HAND, Circuit Judge (dissenting).

When the trustee upon the argument consented to the deletion of the clause in the order directing the bankrupt to execute an assignment by way of further assurance, the appeal became moot as to her. In no event could she have any interest in the property; if her assignment to her mother was valid, her mother was the owner; if it was invalid, the trustee was. I agree that she had the right to appeal from the provision which directed her to execute the assignment—idle formality though it was—and that the appellee's consent did not deprive us of jurisdiction. The question is not what we can, but what we should, do; ordinarily no court decides a question which has ceased to have any real importance for the parties. Indeed, my brothers would not do so here, I apprehend, if they did not also reverse the order so far as it declared that the trustee was entitled to the property as against the widow.

The real question is therefore whether upon the bankrupt's appeal we may, and should, reverse that part of the order also; i. e., whether that appeal opened it up for all purposes. I cannot see that Rule 74 is relevant to that; so far as it goes beyond abolishing summons and severance—a mere procedural archaism which often defeated appeals actually taken—it appears to presuppose that all those who mean to challenge a judgment shall appeal. That is in line with preëxisting law, for the Supreme Court has again and again declared that an appellee may not secure

---

[21] That rule modified the doctrine expressed in Re Skinner & Eddy Corp., 265 U.S. 86, 93, 44 S.Ct. 446, 68 L.Ed. 912; cf. Bronx Brass Foundry, Inc., v. Irving Trust Co., 297 U.S. 230, 56 S.Ct. 451, 80 L.Ed. 657.

[22] It cannot be said that Rule 41 was intended only to prevent the withdrawal of suits by plaintiffs who might thereupon bring new actions. For, under the rule, the dismissal is without prejudice, unless otherwise specified in the order.

1014

any modification in his favor of a judgment unless he appeals. Cleary v. Ellis Foundry Co. 132 U.S. 612, 10 S.Ct. 223, 33 L.Ed. 473; Fitchie v. Brown, 211 U.S. 321, 329, 29 S.Ct. 106, 53 L.Ed. 202; Marine Transit Corp. v. Dreyfus, 284 U.S. 263, 277, 52 S.Ct. 166, 76 L.Ed. 516; Alexander v. Cosden Pipe Line Co., 290 U.S. 484, 487, 54 S.Ct. 292, 78 L.Ed. 452; Helvering v. Pfeiffer, 302 U.S. 247, 250, 58 S.Ct. 159, 82 L.Ed. 231; Le Tulle v. Scofield, 308 U.S. 415, 421, 60 S.Ct. 313, 84 L.Ed. 355. It is true that exceptions have been made to this; and that the question has been considered in a large number of decisions, all of which it is impossible to reconcile; but I believe that the greater number of these hold that it is not alone a ground for reversal that an appellee, similarly situated, would also have won if the law had been rightly applied in the court below. In Kline v. Moyer, 325 Pa. 357, 191 A. 43, 111 A.L.R. 406; Gebhardt v. Village of La Grange Park, 354 Ill. 234, 188 N.E. 372, that was apparently the case; the defendants were joint tortfeasors and therefore severally liable without contribution, and the reversal in favor of the one who appealed did not prejudice the other who did not. But the contrary was held in Geraud v. Stagg, 10 How.Prac. 369; and so too in Polkowski v. St. Louis Public Service Co., 229 Mo.App. 24, 68 S.W.2d 884, 889, as to the appellee's liability, though the case was remanded to reassess the damages, lest there should be two different amounts recoverable for the same wrong. The most common occasion for dispensing with the need of an appeal is when the reversal in favor of the appellant puts the appellee in a worse position than he was before. Thus if one joint obligor appeals and succeeds, the other who has not, loses both his right of contribution and the protection that exists in the rule that the release of one joint obligor releases all. This, I take it, is the explanation of Rowell v. Ross, 89 Conn. 201, 93 A. 236, and kindred considerations account for the result in Merchants Discount Corp. v. Federal Street Corp., 300 Mass. 167. In New York certainly, it was the law until In Re Winburn, 270 N.Y. 196—where the change was placed upon a recent statutory amendment—that it was not enough that the law had been misapplied by the lower court; the rights of the appellee, who would have succeeded had he appealed, had so to enmesh with those of the appellant that the reversal prejudiced him. St. John v. Andrews Institute, 192 N.Y. 382; In Re Union Trust Co., 219 N.Y. 537; In Re Horner, 237 N.Y. 489, 503, 504. In the federal courts I have been able to find only two cases, one of which is clearly in accord with the New York law. Muskogee Nat. Tel. Co. v. Hall, 118 Fed.Rep. 382 (C.C.A. 8). In the other, a surety had sought a general "determination" of its liability, and the Fourth Circuit refused to treat the judgment as limited to the appellants. Maryland Casualty Co. v. South Norwalk, 54 Fed. (2d) 1032, 1039. The "determination" prayed for was apparently treated as a declaration covering the whole class of materialmen generally; and the decision is not in point here.

I believe that we should hold that it is not enough that the law was misunderstood by the lower court, and that it is precisely to raise such questions that the right of appeal is provided. I feel very confident that the bar so understands it and is not misled when we do not disturb judgments in the interest of appellees. Particularly is this appropriate in the case at bar, where the widow has not so much as intimated that she is not content with the order, unless we are to account it such an intimation that the attorney for the bankrupt signs the brief in this court as attorney for her as well as for the bankrupt. It is a sound instinct that confines courts to the decision of disputes and does not seek to redress grievances of which the parties do not complain.

Since for the foregoing reasons I think the appeal should be dismissed, I have not considered the validity of the assignment. Indeed, I should not have done so in any event, because even the bankrupt does not challenge the correctness of the ruling below, but now asserts no more than that the testator's payment was an ademption of the legacy. I quote from her brief: "Appellant rests her case squarely upon the sole proposition that there has been an ademption of her legacy." Again: "We therefore take no issue with the propositions of law and the authorities cited in support thereof as set forth in the opinion of the Court below." Thus, we are insisting upon deciding the case on a point which the only appellant has expressly abandoned, on behalf of a party who has not appealed at all. I am sorry, but I cannot go along with that result.